**NATIONAL RAILROAD PASSENGER CORPORATION, Appellant,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY and the Texas and Pacific Railway Company, Appellees.**

No. 74–1203.

United States Court of Appeals, Eighth Circuit.

Submitted May 17, 1974.

Decided July 26, 1974.

424

Andrew J. Valentine, Counsel, National R.R. Passenger Corp., Washington, D. C. and Kent E. Whittaker, Kansas City, Mo., for appellant.

Kent Snapp, Kansas City, Mo., for appellees.

Before BRIGHT and ROSS, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

Appellant-National Railroad Passenger Corporation (Amtrak) [1] brought this action under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., to compel arbitration by appellee-Missouri Pacific Railroad Company (MoPac) of a dispute over the use of certain rail lines owned by MoPac's subsidiary, appellee-Texas and Pacific Railway Company (Texas and Pacific). The district court dismissed Amtrak's complaint. We reverse.

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. Amtrak is a "for profit" corporation, created pursuant to the Rail Passenger Service

Act of 1970, 45 U.S.C. § 501 et seq., and organized under the laws of the District of Columbia to provide intercity rail passenger service throughout the United States.

The background of the case is fairly simple. In March of 1974, a dispute arose between Amtrak and MoPac concerning the extent of service required to be furnished by the latter under their detailed agreement signed April 16, 1971 (the Basic Agreement). Amtrak proposed to initiate a passenger route between St. Louis, Missouri, and Laredo, Texas, which would use, in part, rail lines between Texarkana, Arkansas, and Dallas, Texas, belonging to Texas and Pacific. Amtrak took the position that the Basic Agreement gave Amtrak the right to utilize this trackage, reasoning as follows:

1) In Section 3.1 of the Basic Agreement, MoPac had agreed to provide Amtrak with all services requested by Amtrak over MoPac's "Rail Lines";

2) The term "Rail Lines" is defined in Section 4.1 of the Basic Agreement as follows:

The "Rail Lines" of Railroad [MoPac] shall include all of its rights-of-way and real properties appurtenant thereto which constitute its trackage, whether owned or leased or otherwise held, and all of its rights to use such properties of others * * *.

3) Texas and Pacific is 96.5 percent owned by MoPac;

4) MoPac has and holds itself out as having the right to use the tracks of Texas and Pacific;

5) Therefore, Texas and Pacific's Texarkana-Dallas lines may be used by Amtrak under the Basic Agreement with MoPac.

The following events occurred on March 13, 1974—the date of the first scheduled run of the proposed new rail service. MoPac notified Amtrak that it rejected the contention that the terms of the Basic Agreement gave Amtrak any rights to operate trains over Texas and Pacific rail lines, and that it refused to supply the requested services between Texarkana and Dallas. Amtrak immediately filed a Demand for Arbitration as required by the Arbitration Agreement, which was signed by MoPac and Amtrak and incorporated by reference into the Basic Agreement. When MoPac refused to submit the dispute to arbitration, Amtrak swiftly filed this action for specific performance of the arbitration clause of the agreement, joining Texas and Pacific as an ancillary party, and sought an injunction restraining defendants from denying or interfering with Amtrak's use of the trackage in question on the St. Louis-Laredo route.

On the same day, the district court issued a temporary restraining order enjoining MoPac and Texas and Pacific from denying Amtrak the use of the lines in question, apparently taking into consideration the fact that the train—already loaded with passengers and public officials for its inaugural run—was scheduled to depart momentarily. Contemporaneously, the court issued its order to show cause why a preliminary injunction should not be granted, returnable two days later. At the show cause hearing, the district court heard testimony in support of the contentions of the parties. Following the hearing, the district court dissolved the restraining order, denied any injunctive relief, and dismissed the action, entering a final, appealable order as requested by Amtrak. The trial court concluded:

The overwhelming weight of the evidence received at the evidentiary hearing of this cause establishes that although Missouri Pacific Railroad owns approximately 96.5% of the stock of Texas and Pacific Railroad, and the two Railroads do share approximately 9 members of their respective Boards of Directors, the Texas and Pacific Railway is an independent and separate entity from the Missouri Pacific Railroad, and the Missouri Pacific Railroad has no "right to use" the trackage, properties, or services of the Texas and Pacific Railroad.

This appeal followed.[2]

■ The sole issue before us is whether Amtrak's claim regarding Texas and Pacific's Texarkana-Dallas rail lines presents an arbitrable dispute.[3] The relevant provisions of Section 6 of the Basic Agreement between Amtrak and MoPac states that:

[A]ny claim or controversy between NRPC [Amtrak] and Railroad [Mo-Pac] concerning the interpretation, application, or implementation of this Agreement shall be submitted to binding arbitration in accordance with the provisions of the Arbitration Agreement * * *.

We think that the present dispute is one "concerning the interpretation, application, or implementation" of the Basic Agreement and is therefore arbitrable.

■ Long ago, Congress enacted the Federal Arbitration Act, Act of Feb. 12, 1925, c. 213 et seq., 43 Stat. 883 (now 9 U.S.C. § 1 et seq.), to make arbitration agreements "valid, irrevocable, and enforceable," 9 U.S.C. § 2. This legislation overruled long-standing judicial precedents, which had refused to enforce agreements to submit justiciable controversies to arbitration on the grounds that they were contrary to public policy.[4] In their stead, a host of new precedents have now arisen, proclaiming "the federal policy to construe liberally arbitration clauses." Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2d Cir. 1961). The motivation for this policy has been noted by the Supreme Court in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L. Ed. 168 (1953), where it was said: "The United States Arbitration Act establishes by statute the desirability of arbitration as an alternative to the complications of litigation." Id. at 431, 74 S.Ct. at 185.

■■ In order to further the use of arbitration as a method of expediting the disposition of commercial disputes and as a means of eliminating the expense and delay of extended court proceedings preliminary to arbitration, Congress provided in 9 U.S.C. § 4 an abbreviated procedure for obtaining specific enforcement of arbitration agreements.[5]

2. On March 20, 1974, Amtrak filed an application with the Interstate Commerce Commission, under the provisions of 45 U.S.C. § 562(c), seeking an order requiring Texas and Pacific to make its Texarkana-Dallas lines available for the duration of the "emergency" occasioned by the dispute between Amtrak and MoPac over the rail lines. On March 21, 1974, the ICC issued that order, which continues in effect until an agreement between the parties is reached, but in no event beyond November 30, 1974.

3. In its brief on appeal, Amtrak argues that "the parties have agreed to submit to the arbitrator not only questions of contract interpretation, but the question of whether or not a dispute has arisen which is on its face within the scope of the agreement to arbitrate," and for that proposition cites an unpublished opinion of Judge Edward J. Devitt, construing an identical agreement. See Burlington Northern Inc. v. National Railroad Passenger Corporation, No. 3–72–Civ–264 (D.Minn., filed Feb. 9, 1973). The question of whether arbitrability is a matter solely for the arbitrators, however, was not raised by appellant-Amtrak in its original complaint or at any other time at the trial stage, and is therefore not properly before us. We ex-

press no opinion on this issue. Cf. note 6 infra.

4. For a scholarly dissertation on the history of judicial attitudes towards the enforcement of arbitration agreements, see Judge Jerome Frank's opinion in Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 982–985 (2d Cir. 1942).

5. 9 U.S.C. § 4 provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five day's notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make

Although the district court has the responsibility of determining whether or not a particular dispute is arbitrable, *see* Necchi v. Necchi Sewing Machine Sales Corp., 348 F.2d 693, 696–697 (2d Cir. 1965), cert. denied, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966), its role in that review is distinctly limited. The applicable standards for this review have been succinctly set forth by the Seventh Circuit in Galt v. Libbey-Owens-Ford Glass Company, 376 F.2d 711 (7th Cir. 1967), where the court stated:

> Under the Federal Arbitration Act, the courts have been assigned the limited role of "ascertaining whether the party seeking arbitration is making a claim which on its face is one governed by the agreement". International Telephone and Telegraph Corporation v. Local 400, 286 F.2d 329, 330–331 (3rd Cir. 1961). As Judge Frank put it in Reconstruction Finance Corporation v. Harrisons & Crosfield, 204 F.2d 366, 368, 37 A.L.R.2d 1117 (2d Cir. 1953), certiorari denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368:
>
> > "the provisions of that [Federal Arbitration] Act—9 U.S.C. § 4— * * * make it clear that a federal court, in a suit asking it to compel arbitration, should (except as noted below in discussing laches) deal with no issues except (1) the making of an agreement to arbitrate, and (2) the failure, neglect or

refusal of the other party to perform that agreement."

The policy of the Federal Arbitration Act is to promote arbitration to accord with the intention of the parties and to ease court congestion. Robert Lawrence Company v. Devonshire Fabrics, Inc., 271 F.2d 402, 410 (2d Cir. 1959), certiorari dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37. All doubts are to be resolved in favor of arbitration. Metro Industrial Painting Corp. v. Terminal Construction, 287 F.2d 382, 385 (2d Cir. 1961). Whenever possible, the courts will use the Federal Arbitration Act to enforce agreements to arbitrate. See Monte v. Southern Delaware County Authority, 321 F.2d 870, 874 (3d Cir. 1963). [376 F.2d at 714.]

To be sure, a frivolous or patently baseless claim should not be ordered to arbitration, but the court's function in an action to compel arbitration may not extend beyond ascertaining whether the party seeking arbitration has made a claim which *on its face* is governed by the contract. *See* Hamilton Life Insurance Co. of New York v. Republic National Life Insurance Co., 408 F.2d 606, 609 (2d Cir. 1969).

■ Although arbitration of labor disputes can and should be distinguished from commercial arbitration, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960),

---

an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of ap-

plication, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

the cases in the labor field as exemplified by the *Steelworkers* trilogy [6] do illustrate the general requirement that courts give arbitration agreements "full play." In that regard, the following statements of the Supreme Court are relevant:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware. [United Steelworkers of America v. American Manufacturing Co., 363 U. S. 564, 567–568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960) (footnotes omitted).]

\*   \*   \*   \*   \*   \*

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. [United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960) (footnote omitted).]

Here, the trial court was only called upon to determine whether there was facially raised a colorable dispute within the framework of the arbitration agreement by Amtrak's contention that the "Rail Lines" of MoPac as defined by the Agreement encompassed the trackage of Texas and Pacific because of the subsidiary relationship between the two. Amtrak supported the contentions in its pleading with evidence showing that MoPac owned substantially all of Texas and Pacific's stock and thereby controlled the election of Texas and Pacific's Board of Directors.[7] Amtrak also introduced evidence that MoPac holds itself out to the public as operating a single system of rail service over its lines and those of Texas and Pacific. Amtrak thus demonstrated a colorable basis for, and the arbitrable nature of, its claim that the existence of the Basic Agreement obligated MoPac to provide Amtrak services and facilities on the rail lines of its subsidiary railroad, Texas and Pacific.

Upon evidence introduced by MoPac and Texas and Pacific of the fact of their separateness and of the independent operations of each, however, the district court proceeded to resolve the factual elements of the controversy, stating as follows:

The evidence before the Court in this cause establishes beyond any reasonable doubt that the Texas and Pacific Railroad is not a party to any contract with plaintiff regarding the use of the

**6.** United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960) ; United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**7.** The majority of the members of the Board of Texas and Pacific are members of the Board or employees of MoPac or of Texas and Pacific.

trackage in question. Furthermore, there is no reasonable inference to be drawn from the Agreement between plaintiff and Missouri Pacific which would, in the light of the evidence adduced, cause the term "Rail Lines" as used in the agreement to include the trackage of Texas and Pacific Railroad Company. In light of the evidence before this Court, to require the Texas and Pacific Railway to provide the requested services to plaintiff, while the Missouri Pacific Railroad and plaintiff "arbitrate" whether plaintiff has this right under plaintiff's contract with Missouri Pacific, would be to totally disregard the fact that the Missouri Pacific Railroad and the Texas and Pacific Railway are separate corporate entities. Plaintiff has failed in its proof to establish any reason why these separate and distinct entities should be merged and treated as a single corporation. The evidence establishes that heretofore plaintiff considered the corporations separate by attempting to negotiate separate contracts for the use of the trackage of the two railroads. And, plaintiff's evidence fails to establish that both railroads should now be brought under the terms and conditions of the Contract which plaintiff has entered with Missouri Pacific.

Because of the strong weight of the evidence in favor of the position of the defendants, the Court declines to order that the question of whether the term "Rail Lines" includes the trackage of Texas and Pacific Railway, a separate legal entity not a party to the contract be submitted to arbitration. To require this separate entity to provide the services demanded by plaintiff without provision for its compensation and potential liability would not, under the facts of this case, be justified.

■ The district court erred in proceeding to the merits of the dispute. The record clearly establishes a controversy between the parties as to whether Texas and Pacific's rail lines may be used by Amtrak under the Basic Agreement with MoPac. That being so, the dispute ought properly to have been submitted for arbitration.

Reversed and remanded for entry of an order consistent with this opinion.