322

In the Matter of the Arbitration between
the **SINGER COMPANY,**
Petitioner,

and

The **TAPPAN COMPANY,**
Respondent.

**Civ. A. No. 75–757.**

United States District Court,
D. New Jersey.

Oct. 20, 1975.

Riker, Danzig, Scherer & Debovoise, Newark, N. J., Winthrop, Stimson, Put- nam & Roberts, New York City, of coun- sel, for petitioner.

Clapp & Eisenberg, Newark, N. J., for respondent.

## OPINION

LACEY, District Judge:

### PRELIMINARY

Presented is the issue of arbitrability of a certain dispute between the parties. For the reasons hereinafter set forth, I find in favor of the petitioner and grant its motion to compel arbitration. The cross motion of the respondent is denied.

### PRIOR PROCEEDINGS

On May 6, 1975 the Singer Com- pany (Singer) commenced this diver- sity action, 28 U.S.C. § 1332, proceeding under the United States Arbitration Act (the Act), 9 U.S.C. §§ 1–14 (1970), by a Motion to Compel Arbitration and seeking an order directing respondent, The Tappan Company (Tappan), to pro- ceed to arbitration under a certain Agreement to Purchase (Agreement), dated February 25, 1972, and annexed to Singer's Petition as Exhibit A.[1] Tap- pan then filed a Cross-Motion to Dis- miss for Absence of an Indispensable Party, and its Answer and Demand for a Jury Trial. Having heard oral argu-

---

1. 9 U.S.C. § 2 provides:

A written provision in any maritime trans- action or a contract evidencing a transac- tion involving commerce to settle by ar- bitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

"[C]ommerce" is defined in 9 U.S.C. § 1, as commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Terri- tory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation

. . . . . .

Diversity jurisdiction by itself does not render the Act applicable. *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956) ; *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Com- mission*, 387 F.2d 768 (3d Cir. 1967). Here, however, the parties obviously are in accord that the Agreement is one "evidencing a trans- action involving commerce". *Cf. Metro In- dustries Painting Corp. v. Terminal Construc- tion Co.*, 287 F.2d 382 (2d Cir. 1961), setting the test as whether at the time they entered into their agreement and accepted the arbitra- tion clause, the parties contemplated substan- tial interstate activity.

ment, I requested and received additional submissions from the parties which have waived further oral argument.

## THE FACTS

On February 9, 1972 Tappan and American Standard Inc. (American) entered into an Agreement of Purchase and Sale (American Agreement), Tappan acquiring the assets of five American divisions, the Environmental Comfort Systems Group (ECSG). Thereafter, Singer acquired from Tappan under their Agreement two of the ECSG divisions, The Commercial Air Conditioning Division (CACD) and the Wilmington Coil Division (WCD). Tappan concedes the making of this Agreement, which embodies an arbitration provision; but it denies that the issues here in dispute were intended by the parties to be arbitrable under that provision.

Under Section 2.2 of the Agreement Singer and Tappan were to deliver to Arthur Young & Co. (AY), American's accountant, and later to Peat, Marwick, Mitchell & Co. (PMM), Singer's accountant, a combining divisional balance sheet of ECSG as of January 31, 1972, "prepared in accordance with generally accepted accounting principles consistent with those applied in the preparation of the August 31, 1971 combining divisional balance sheet of ECSG." PMM was to review that portion of the January 31, 1972 combining divisional balance sheet and AY report pertaining to the sale to Singer, defined as the Closing Balance Sheet, to determine "compliance thereof with the principles which the parties have agreed above shall be followed in its preparation. . . ."

If PMM, after such review, raised objections which were not resolved by agreement of the accounting firms, or of the parties, the "matter" was to be "referred to arbitration." Thus I find that it is the question of whether the Closing Balance Sheet was "prepared in accordance with generally accepted accounting principles consistent with those applied in preparation of the August 31, 1971 balance sheet of ECSG" which the parties intended to be referred to arbitration under the Agreement should a dispute in connection therewith go unresolved.

Pursuant to Section 2.2, PMM rereceived the financial report on April 28, 1972; and on May 10, 1972, by letter to Ernst & Ernst (E&E), Tappan's accountant, raised objections thereto.

On May 26, 1972, in response to Tappan's oral request for a meeting to discuss PMM's objections, Singer's L. J. Clark wrote to L. B. Ellison of Tappan agreeing to a meeting, but stating that ". . . I feel the subject of this meeting should be discussion of the selection of an arbitrator as defined in . . . the agreement". *See* Exhibit B to Ellison Affidavit.

That meeting took place on June 5, 1972. Attending were representatives of Tappan, Singer, and the three accounting firms. The parties to the meeting, including Clark, agreed that, instead of proceeding to arbitration at once, the three accounting firms "should be able to satisfy many of the questions, or objections" in PMM's letter of May 10, 1972. *See* Ellison letter to Clark, dated June 12, 1972, Exhibit C to Ellison Affidavit. Of major significance as bearing upon the matter at bar, Ellison wrote in part:

7) We agreed that point 6 deals with the heart of our discussions, namely, the values established for reserves for bad debts on CACD and estimated future warranty reserves for CACD. A rather lengthy discussion was held in which Bill Slattery of Arthur Young & Company, set forth their overall philosophy in support of the audit work they performed; that the values set forth in their preliminary audit report were reasonable based on the information available and provided to them by company personnel; and, that the reserves were established consistent with the methods em-

ployed, as set forth in their audit report of August 31, 1971. It was agreed that copies would be made of the Arthur Young & Company audit work papers regarding accounts receivable and warranty reserves, and that these working papers would be made available to Peat, Marwick, Mitchell & Co.

It was agreed that this same group would reconvene on Thursday, June 22, 1972, at 9:30 A.M. in the offices of Peat, Marwick, Mitchell & Co., to further review the information pertaining to the receivables and warranties. In the meantime, Peat, Marwick, Mitchell & Co. was to briefly summarize those points as originally set forth in their May 10, 1972 letter, on which they are now satisfied, and no further work need be done.

The June 22, 1972 meeting referred to in Ellison's letter was never held, and, for the several reasons set forth in the August 22, 1975 affidavit of Singer's Clark, nothing further was submitted to respondent by PMM. Instead, Singer retained another accounting firm to investigate and review, and advise Singer on, the disputed items. As to this, and to explain Singer's delay in invoking the arbitration provisions, Mr. Clark has averred (*Id.*):

"9 . . . The purpose of retaining Leidesdorf was to ensure that Singer did not commence an arbitration against Tappan . . . unless Singer had a good claim to a substantial amount of money. Leidesdorf's review of the books and records of CACD bearing on such reserves took far longer than expected. . . .

10. Moreover, during June and July, 1972 Singer and Tappan were heavily engaged in negotiations unrelated to the dispute. . . . In addition, during the balance of 1972 Singer was engaged in negotiations with Tappan to obtain assignments of the patents, patent applications and the files of the pending patent cases related to the businesses acquired by Singer from Tappan to which Singer was entitled under § 1.1.7 of the Agreement. Tappan was then refusing to assign these items to Singer. . . . Finally, Singer and Tappan have had an ongoing business relationship throughout the period 1972–1975. . . .

11. In April, 1973, after the expenditure of a very substantial amount of time and effort and at a substantial cost, Leidesdorf advised Singer's attorneys that in its opinion the warranty and receivables reserves were understated by the amounts set forth in Singer's letter demanding arbitration. However, only the passage of time and CACD's actual subsequent experience with expenditures for future warranty costs on air conditioners sold prior to January 31, 1972 and collection of accounts receivable then outstanding would determine whether these reserves were in fact inadequate.

12. Moreover, Singer recognized that any arbitration proceeding commenced by it against Tappan would be expensive, time consuming and disruptive for all parties involved. Accordingly, Singer refrained from demanding arbitration until it could determine whether, in fact, the warranty and receivables reserves reflected in the Closing Balance Sheet were inadequate and, if so, by what amounts.

13. During the second half of 1974 Singer requested Leidesdorf to perform a subsequent events review with respect to the CACD warranty and receivables reserves and to advise it as to what Singer's actual experience had been in these two areas. Leidesdorf reported to Singer in early 1975 that the amount of future warranty costs attributable to the warranty reserve had been even higher than it had anticipated and that the uncollectible accounts receivable had been approximately the same as Leidesdorf had advised they would be. Upon

receipt of this advice Singer commenced the instant arbitration proceeding. . . .

14. Singer believes that its delay in commencing the arbitration proceeding until February, 1975 was entirely reasonable and justified. First, the passage of time could not jeopardize either Singer or Tappan's ability to present evidence as to what the warranty and receivables reserves should have been. . . . Second, Singer was convinced that this delay in instituting the arbitration proceeding would not prejudice Tappan in any way. . . .

Singer's delay in invoking arbitration has been argued by Tappan as inconsistent with certain specific provisions of their Agreement, as follows:

Section 2.2.

If within 20 days from the time the objection shall first be raised by Peat, Marwick, Mitchell & Co. the matter shall not be resolved by agreement of the parties, the matter shall be referred to arbitration before an arbitrator which shall be another national accounting firm to be selected by the parties. . . .

Section 8.5 which provides that certain actions under the Agreement must be taken "promptly" and "as early as practicable".

Tappan's contentions with respect to the applicability of these provisions to this proceeding will be discussed in more detail hereinafter.

Returning to the chronological development, on February 13, 1975 Singer's counsel wrote as follows to Tappan (Exhibit E to Ellison Affidavit):

Dear Mr. Tappan:

As you are aware, The Singer Company and The Tappan Company have not yet resolved their dispute with respect to the final adjusted purchase price to be paid by Singer for its acquisition from Tappan of the Wilmington Coil Division and the Commercial Air Conditioning Division.

Singer's position with respect to the dispute is set forth below.

Pursuant to an Agreement to Purchase dated as of February 25, 1972 (the "Agreement") Singer agreed to purchase from Tappan the assets, subject to certain liabilities of the Wilmington Coil Division ("WCD") and the Commercial Air Conditioning Division ("CACD") which were formerly divisions of the Environmental Comfort Systems Group ("ECSG") of American Standard, Inc. ("American Standard"). The Agreement recites that Tappan had purchased ECSG in its entirety from American Standard under a separate Agreement of Purchase and Sale dated as of January 31, 1972. (the "A–S Agreement") The A–S Agreement is referenced in many instances in the Agreement.

The Agreement provided that the price Singer was to pay Tappan for the purchase of the assets of WCD and CACD was to be "the net book value of the Assets as reflected in the Closing Balance Sheet plus an amount equal to 5% of such net book value" (the "Purchase Price"). (Agreement § 2.1) The Closing Balance Sheet is defined in the Agreement as "the columns of assets and liabilities included in . . . [the] January 31, 1972 combining divisional balance sheet of ECSG under the headings 'Commercial Air Conditioning Division' and 'Wilmington Coil Division', after interdivisional eliminations." (Agreement § 2.2) The Agreement further provided that Singer was to pay Tappan $17.5 million at the closing, with the balance, if any, payable within 10 days after receipt of the Closing Balance Sheet. (Agreement §§ 2.1.1 and 2.1.2) If, on the other hand, the Closing Balance Sheet disclosed that the $17.5 million was an overpayment of the Purchase Price, the Agreement provided that within 10 days after receipt of the Closing Balance Sheet

Tappan would pay Singer the full amount of any such overpayment. (Agreement § 2.2)

The Agreement specified that the Closing Balance Sheet was to be prepared as follows:

(a) Immediately following the closing, Tappan and Singer were to prepare and deliver jointly to Arthur Young & Co. ("Arthur Young"), American Standard's independent auditors, a combining divisional balance sheet of ECSG as of January 31, 1972. This combining divisional balance sheet was to be "prepared in accordance with generally accepted accounting principles consistent with those applied in the preparation of the August 31, 1971 combining divisional balance sheet of ECSG included in Exhibit III to the A–S Agreement." (Agreement § 2.2)

(b) On the basis of the combining divisional balance sheet of ECSG as of January 31, 1972 prepared and delivered to Arthur Young, Tappan was to prepare a combined divisional balance sheet of ECSG as of January 31, 1972. This combined divisional balance sheet of ECSG was also to be submitted to Arthur Young.

(c) Arthur Young was to audit and report upon the combined divisional balance sheet of ECSG as of January 31, 1972.

(d) Following receipt of the combined divisional balance sheet of ECSG as of January 31, 1972 and the Arthur Young report with respect thereto, Peat, Marwick, Mitchell & Co. ("Peat, Marwick"), Singer's independent auditors, had 15 days within which to object to the portions thereof pertaining to the Closing Balance Sheet. Peat, Marwick was to bring any such objections to the attention of Arthur Young and Ernst & Ernst, Tappan's independent auditors, in an effort to resolve them. If the three accounting firms were unable to resolve the Peat, Marwick objections, the parties were to be notified of the dispute. Failing resolution of the Peat, Marwick objections by the three accounting firms or by the parties, the Agreement provided for arbitration of the dispute.

At the closing in February, 1972 Singer, pursuant to the Agreement, paid Tappan $17.5 million.

In accordance with the Agreement Singer prepared its portion of the combining divisional balance of ECSG as of January 31, 1972 and delivered it to Tappan. Tappan then prepared the complete combining divisional balance sheet of ECSG as of that date, and on March 29, 1972 submitted it to Arthur Young. At about the same time Tappan also submitted to Arthur Young a combined divisional balance sheet of ECSG as of January 31, 1972.

On April 28, 1972 Arthur Young delivered to Singer and Peat, Marwick a proposed unsigned report. The Arthur Young report apparently ignored both the Tappan combining divisional balance sheet and the Tappan combined divisional balance sheet and instead addressed itself to a different combined divisional balance sheet for ECSG as of January 31, 1972, purportedly prepared by American Standard. The American Standard combined divisional balance sheet for ECSG as of January 31, 1972 treated in the Arthur Young report was accompanied by a combining divisional balance sheet presumably prepared by American Standard.

On May 10, 1972, Peat, Marwick raised objections to the Arthur Young report. There followed discussion between Peat, Marwick, Ernst & Ernst and Arthur Young, but the three accounting firms were unable to resolve these objections. The Peat, Marwick objections were therefore referred directly to Singer and Tappan.

During the respective discussions between the three accounting firms and between Singer and Tappan, two distinct controversies have arisen: (a) the proper amount to be reflected

in the Closing Balance Sheet for the CACD reserve for future warranty costs (the "warranty reserve"), and (b) the proper amount to be reflected in the Closing Balance Sheet for the CACD reserve for uncollectible receivables (the "receivables reserve").

Singer has undertaken an extensive investigation of the merits of its claim against Tappan and is prepared to support its position that the Closing Balance Sheet with respect to CACD should have reflected a warranty reserve of not less than $1,468,000 and a receivables reserve of not less than $1,361,000. The Closing Balance Sheet with respect to CACD actually reflected a warranty reserve of $639,000 and a receivables reserve of $750,000. Such reserves actually reflected on the Closing Balance Sheet were not established in accordance with generally accepted accounting principles as required by the Agreement.

In addition, the $17.5 million which Singer paid Tappan at the closing was $91,000 in excess of the net book value of the assets as reflected in the Closing Balance Sheet plus 5% of such net book value. Accordingly, Singer overpaid Tappan by $91,000 without regard to the question of the adequacy of the warranty and receivables reserves.

Singer hereby exercises its right under § 2.2 of the Agreement to have the above dispute arbitrated before a national accounting firm to be selected by the parties. In view of the above Singer is entitled to $91,000 for the overpayment based on the Closing Balance Sheet and a downward adjustment of the purchase price in the amount of $1,512,000, plus interest on the sum of such amounts from the date of the closing.

· Despite the instant demand for arbitration, Singer has not abandoned the hope that an amicable solution to this matter is still possible. Towards this end Singer is willing to enter into renewed discussions with Tappan.

Subsequent discussion between the parties were fruitless; and the instant proceeding was then commenced.

## THE LAW

The United States Arbitration Act, first enacted in 1925, Act of February 12, 1925, ch. 213 *et seq.*, §§ 1–15, 43 Stat. 883 was intended to override the long standing judicial hostility to arbitration on public policy grounds, and to make arbitration agreements "valid, irrevocable, and enforceable". 9 U.S.C. § 2. *See* H.R.Rep.No.96, 68th Cong., 1st Sess. 1–2 (1924). The tide, slow to turn, *cf. Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 985 (2d Cir. 1942),[2] has now arrived at the flood, so that "the federal policy [is] to construe liberally arbitration clauses". *Metro Industrial Painting Corp. v. Terminal Construction Co.*, 287 F.2d 382, 385 (2d Cir. 1961). The federal courts, developing a body of federal law, even in diversity cases, *cf. Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); and see Frankfurter, J., concurring in *Bernhardt v. Polygraphic Co. of America, supra*, 350 U.S. at 208, 76 S.Ct. 273, have created certain canons of interpretation of contractual arbitration clauses, commencing with *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402 (2d Cir. 1959), *cert. granted*, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960), holding, under a broad arbitration clause, that the issue of fraud in the inducement of the agreement embodying the arbitration

2. Thus Judge Frank in *Kulukundis* said:
 In the light of the clear intention of Congress, it is our obligation to shake off the old judicial hostility to arbitration. Accordingly . . . we should not follow . . . decisions which have narrowly construed the terms of arbitration agreements or arbitration statutes. (Footnote omitted)

 Reference to such "hostility" in commercial arbitration is made in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

provision, was under federal law arbitrable.[3]

One of the most important of these canons, as enunciated in *Lawrence,* is that there exists "[a] liberal policy of promoting arbitration both to accord with the original intention of the parties and to help ease the current congestion of court calendars." 271 F.2d at 410. Following *Lawrence,* the Supreme Court put a stamp of approval upon the "liberal policy" doctrine in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), which affirmed as well the federal law concept, see n. 3, *supra,* even to the point of holding that an arbitration clause is "separable" from the agreement embodying it. 388 U.S. at 402, 87 S.Ct. 1801.[4]

█ What emerges then is this principle, that in interpreting the scope of an arbitration clause, that is, in endeavoring to determine what the parties intended would be arbitrable, federal courts are not to apply the traditional rules of construction, but rather a federal rule that seemingly requires a clearly expressed intent *not* to arbitrate an issue before such issue can be ruled one for judicial determination; and, further, that if the issue is a doubtful one, the doubt is to be resolved in favor of arbitration.[5] *Cf. Hussey Metal Division v. Lectromelt Furnace,* 471 F.2d 556 (3d Cir. 1972). We can fairly say that the Act reflects a legislative determination of the desirability of arbitration as an alternative to litigation.

Thus the threshold question is whether the parties agreed to arbitrate the dispute raised herein by Singer. Whether a party must arbitrate at all, and what issues it must arbitrate, are matters for judicial determination. However, where the issue is a close one, as the Court of Appeals of this Circuit has indicated in *Hussey,* 471 F.2d at 558, dealing with a state arbitration statute, the decision should be in favor of arbitration unless it can be said with "positive assurance" that dispute was not meant to be arbitrated.[6]

3. The *Lawrence* court found (271 F.2d at 404–05):

. . . a reasonably clear legislative intent to create a new body of substantive law relative to arbitration agreements affecting commerce or maritime transactions. Thus we think we are here dealing not with state-created rights but with rights arising out of the exercise by the Congress of its constitutional power to regulate commerce . . . . .

*Cf. Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), in the area of collective bargaining agreements and arbitration clauses, and its construction of § 301 of the Labor Management Relations Act of 1947 regarding the fashioning of a body of federal law.

4. The issue of "separability" is reflected in the area of labor disputes. Thus the Supreme Court in *Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers International, AFL–CIO,* 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), held that even though a no-strike promise is the *quid pro quo* for a promise to arbitrate, the relationship between the two is not so inflexible that one party's violation of the no-strike ban excuses the other party from its contract to arbitrate. Indeed, the obligation to arbitrate survives a breach of the collective bargaining agreement other than an outright repudiation of the promise to arbitrate by the party seeking arbitration.

5. Enthusiasm for arbitration is lacking in certain situations, e. g., in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held it improper to give effect to an arbitration clause when the Securities Exchange Act was involved; and where anti-trust claims were involved, arbitration of those claims was held improper. *Cobb v. Lewis,* 488 F.2d 41 (2d Cir. 1974).

6. This Court will assume that there is still *some* distinction between principles relating to arbitrability of labor disputes, where there is "the now well-known presumption of arbitrability", and commercial disputes. *Gateway Coal Co. v. Mine Workers,* 414 U.S. 368, 377–79, 94 S.Ct. 629, 637, 38 L.Ed.2d 583 (1974). The words "positive assurance", however, were used by the Supreme Court in a labor dispute context, *Gateway* quoting from *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). A most recent exposition, of the various doctrinal consideration, again in a labor relations context, is in *Blake Construction Co., Inc. v.*

The trend in the direction of deciding doubtful cases in favor of arbitration has become more and more pronounced. Thus the Court of Appeals for the First Circuit recently said, in holding certain third-party claims subject to arbitration and stay provisions:

> This is not to say that an arbitrator could not determine that certain aspects of PPG's third-party complaint or the defenses raised thereto fall outside the scope of the arbitration clause. The arbitrator must ultimately pass on the outer boundaries of what is arbitrable. But we think that claims for contribution between PPG and Fluor, on whatever legal theory premised, are arbitrable at least until and unless it is otherwise decided by the arbitrator. The stay should have been granted. *Acevedo Maldonado v. PPG Industries, Inc.*, 514 F.2d 614, 617 (1st Cir. 1975)

The same court also stated:

> Third-party plaintiffs also argue that it is against public policy to have the third-party complaint proceed independently through arbitration rather than in conjunction with the original action. But Puerto Rico like Congress encourages arbitration of disputes. 32 L.P.R.A. §§ 3201–29; *see* 9 U.S.C. §§ 1–9. If a claim of right to arbitration could be foreclosed whenever a dispute between the parties to the contract derives from another person's claim against one of the parties, the utility of broad arbitration agreements would be undermined. . . . *Ibid.*

Indeed, if it can be said, as it was most recently, that "[t]he public policy in favor of international arbitration is strong", *Fotochrome, Inc. v. Copal Company, Ltd.*, 517 F.2d 512 (2d Cir. 1975), then, *a fortiori*, the judicial bow of deference to arbitration is even more sweeping in cases involving domestic arbitration.

The Court of Appeals of this Circuit, while recognizing a distinction between labor and commercial arbitration principles, has on the other hand also drawn parallels between the two. *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1125 (3d Cir. 1969). Thus, when the Court of Appeals grounds the policy of judicial non-interference and restraint on the fact that a labor arbitrator is better able to decide complex labor issues than a judge, *Lewis v. American Federation of State, County and Municipal Employees*, 407 F.2d 1185, 1191 (3d Cir.), *cert. denied*, 396 U.S. 866, 90 S.Ct. 145, 24 L.Ed.2d 120 (1969), then it can likewise be said here that the accounting complexities which led to disagreement between well known and highly regarded accounting firms should likewise be best left for arbitration, if not inconsistent with the parties' Agreement.

Section 4, 9 U.S.C.,[7] under which this proceeding is brought, provides an ab-

---

*Laborers' Int. U.*, 167 U.S.App.D.C. 86, 511 F.2d 324, 327 (1975):

> To be sure, duty to arbitrate rests on contract, and submission to arbitration is compellable only to the extent that there is agreement to do so. The role of the courts is "confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract," and the judicial task is limited to construing the agreement for that purpose. But "[a]n order to arbitrate the particular grievance," the Court instructs, "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*See also Local 103 v. RCA Corp.*, 516 F.2d 1336, 1339 (3d Cir. 1975).

7. 9 U.S.C. § 4 provides:

> A party aggrieved by the alleged failure, neglect or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . If the making of the arbitration agreement or the

breviated procedure for obtaining specific enforcement of arbitration agreements,

> to further the use of arbitration as a method of expediting the disposition of commercial disputes and as a means of eliminating the expense and delay of extended court proceedings preliminary to arbitration . . ..

*National R.R. Passenger Corp. v. Missouri Pacific R.R. Co.*, 501 F.2d 423, 426 (8th Cir. 1974).

In fulfilling its responsibility under the Act, *see Necchi v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 696–697 (2d Cir. 1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966), this court must first determine whether the presented dispute is arbitrable. *Monte v. Southern Delaware County Authority*, 326 F.2d 870, 874 (3d Cir. 1973); *International Telephone and Telegraph Corp. v. Local 400*, 286 F.2d 329, 330–31 (3d Cir. 1961).

### ANALYSIS OF SINGER'S CLAIM

 Against the foregoing factual and legal backdrop, it is plain that the dispute raised by Singer is within the arbitration clause of the Agreement.

Under Section 2.2 of the Agreement the parties agreed to submit to arbitration any question as to whether the Closing Balance Sheet was prepared in compliance with the "principles which the parties have agreed . . . shall be followed in its preparation." One such

principle was whether the Closing Balance Sheet was "prepared in accordance with generally accepted accounting principles consistent with those applied in preparation of the August 31, 1971 combining divisional balance sheet of ECSG. . . ." *Id.*

Singer's Petition seeks arbitration of the issue whether the warranty and receivables reserves of the Closing Balance Sheet were "established in accordance with the generally accepted accounting principles as required by the Agreement." Thus the claim includes not only (1) the question of whether generally accepted accounting principles were used in connection with the establishment of these reserves, but also (2) whether such principles were consistent with those used in the preparation of the August 1971 balance sheet. The Petition was obviously drafted to be congruent with the arbitration provisions of the Agreement to which it refers. I find the effort to have been successful.

Tappan claims that Singer simply seeks to arbitrate whether the Closing Balance Sheet was prepared in accordance with "generally accepted accounting principles". I do not so construe the Petition. Parenthetically, I note that when, in 1972, the parties were in discussion, and Singer's Clark indicated that he intended to invoke the arbitration provisions of their Agreement, Tappan did not assert what it now does, that the dispute was not arbitrable.[8]

---

failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement

in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

8. I do not regard as significant in this respect that the amounts now mentioned are different from those discussed in 1972. The $91,000 item may or may not be recoverable; but it is up to the arbitrator to make the decision, not this court. *See* Resp.Br., at 7. Nor is Tappan entitled to a jury trial under

**332**

## TIMELINESS, LACHES AND WAIVER

Tappan also claims Singer has "relinquished" any rights to arbitration it may have had under the Agreement. The several aspects of this position will be dealt with in the order set forth, and under the headings used, in Tappan's Brief. Resp.Br., at 13 *et seq.*

"A. Any Right to Arbitration Enjoyed by Singer Expired on May 30, 1972, or at a Reasonable Time Thereafter"

■ Section 2.2 of the Agreement required that if objections were raised by PMM, and not resolved by the accountants and the parties within 20 days from the time the objections were first raised, they were to be referred to arbitration before another national accounting firm. Thus PMM's May 10, 1972 letter states in pertinent part:

In view of the twenty-day period provided for in the Agreement for the resolution of objections, we would like to schedule a meeting in New York to discuss these objections as soon as possible.

Tappan argues that the meaning of the clause is that Singer had to "refer its objections to arbitration" by May 30, 1972, within 20 days after PMM's objections were expressed and, I suppose, would have this court, not the arbitrator, rule that Singer's petition be dismissed.

Assuming without deciding that I have the power to function as Tappan would have me do, I do not so read the language in Tappan's favor. The pertinent words give the parties 20 days to resolve by agreement any objections raised by PMM. Then, "the matter shall be referred to arbitration before an arbitrator which shall be another national accounting firm to be selected by the parties." For Tappan's view to prevail, Singer would not only have to demand arbitration within 20 days of PMM's letter but would have had to obtain Tappan's agreement upon the "national accounting firm", arrange the terms of that firm's retention, and then refer "the matter" to it. Judged in the light of this analysis, and considering that both parties were represented by learned legal draftsmen, I could not draw from the language used the strained and distorted meaning for which Tappan now contends.[9] Instead I find in the Agreement no time limit within which arbitration had to be commenced.

■ The second aspect of Tappan's timeliness argument is that the Agreement required that Singer invoke the arbitration provision "promptly" and "as early as practicable" under Section 8.5 of the Agreement. Fatal to the claim is that these requirements are not found in the arbitration clause. Even if applicable, however, this is a classic issue for arbitration.

■ Tappan cites no authority, and engages in no logical analysis, to support its view. On the other hand, supportive of Singer's position is that the judicial function is not only limited under § 4 of the Act as previously discussed; it is also limited in terms of what defenses a court can consider on a Petition for arbitration. Thus under 9 U.S.C. § 3, it can assess whether "the applicant for the stay [under Section 4] is . . . in default in proceeding with such arbitration." A delay in making an arbitration demand is not a "default" within the meaning of Section 3. *Almacenes Fernandez, S.A. v. Golodetz,* 148 F.2d 625, 627–28 (2d Cir. 1945); *see also Halcon International, Inc. v. Monsanto Australia Ltd.,* 446 F.2d 156, 161 (7th Cir. 1971).

9 U.S.C. § 4. Such is required only where "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue . . . ." Tappan's attempt to create a doubt over what the parties meant, Resp.Br., at 11–12, and thereby require a jury fact finding, fails.

9. Actually, the frivolousness of this claim is highlighted by Tappan's failure to support it with any documentation in affidavit form or otherwise from those who represented it in the drafting of the Agreement.

The other defenses to a Petition for arbitration which may be raised are those found in Section 2 of the Act which holds an arbitration agreement to be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract". Tappan's timeliness claim, based on requirement of "promptly" and "as early as practicable" does not rise to the level of "grounds . . . for the revocation of any contract".[10]

"B. The Arbitration Agreement Has Been Modified and Superseded by the Agreement of June 5, 1972 Among the Parties to Settle Singer's Objections Among Themselves."

Tappan next contends that representatives of Singer and Tappan agreed on June 5, 1972 that PMM's objections would not be submitted to arbitration and that the parties and their accountants would resolve these objections among themselves, thus extinguishing or revoking the arbitration clause.[11] I assume that Tappan claims that this amounts to an "unmaking" of the arbitration agreement, which, like the "making" of one, entitles it to a jury trial. Cf. Halcon International, Inc. v. Monsanto Australian Ltd., supra, 446 F.2d at 159. Alternatively, it may be contending that its allegations amount to a "revocation" under Section 2 of the Act. Id.

Irrespective of whatever legal theory it invokes, however, it is a hollow claim, totally without factual support. Indeed, a fair reading of the Ellison affidavit and the Ellison letter of June 12, 1972 leads to only one conclusion, that neither party surrendered its rights under the arbitration provisions of the Agreement.

"C. Singer Has Waived Any and All Rights to Arbitration by Its Conduct Subsequent to the Singer Agreement."

Tappan next claims "waiver" by Singer of its right to arbitration by virtue of its failure to invoke arbitration until February 1975, by its participation in the June 5, 1972 meeting, and by virtue of "prejudice" to Tappan from Singer's delay.

Again, Tappan's argument is devoid of true legal analysis of the Act. Presumably it would rest upon the theory that "waiver" amounts to a Section 3 "default". It is clear no such default, as argued by Tappan, arises from delay in claiming arbitration. Halcon International, Inc. v. Monsanto Australia Ltd., supra, 446 F.2d at 161. I will deal with "waiver" in the laches or estoppel sense under the next portion of this opinion.

"D. By Delaying For Nearly Three Years Before Commencing Its Action to Compel Arbitration, Singer is Barred from Arbitration by Laches, or Estoppel."

The ready answer to Tappan's claim of laches and estoppel is furnished by Halcon International, Inc. v. Monsanto Australia Ltd., supra, 446 F.2d at 160–63, and cases therein cited. Tappan's attempt to distinguish these cases, by arguing that they rest on a "broad" arbitration clause, fails. Thus at the heart of the Halcon court's analysis, 446 F.2d at 160–62, is not that the arbitration clause was broad, but rather that, under the Act and its interpretation by Prima Paint, supra, and its progeny, the judicial function is limited to determining whether an asserted defense can be equated to "revocation" of Section 2 or "default" of Section 3. This is not to say, of course, that a clearly demonstrated intent by the parties to exclude certain disputes from arbitration will not be

---

10. Tappan's reliance upon Milton Schwartz & Assoc., Architects v. Magness Corp., 368 F. Supp. 749 (D.Del.1974), is misplaced. The District Court there decided the issue of reasonableness, but under the Pennsylvania Arbitration Act.

11. It is not "difficult" as Singer says (Pet'r. Reply Br., at 14) to reconcile this contention with Tappan's claim that Singer's right to arbitrate expired on May 30, 1972; it is impossible.

honored; it will. There is not here, however, such an expression in the Agreement. The issue of what the parties contracted for, however, is, in commercial arbitration cases under the Act, to be treated separately from the issue of defenses under Sections 2 and 3. The "making" of the agreement,. which would include of course not only the question of arbitration *vel non*, but also what issues are to be arbitrated, is covered by Section 4.[12]

■ That the issue of laches in this case is peculiarly one for the arbitrator is evidenced by the prejudice Tappan claims to have suffered from the alleged delay. Its linking of the Singer-Tappan and American-Tappan transactions with complex accounting concepts puts us into what a court in another context described as "the often esoteric field of commercial dealings". *Trafalgar Shipping Co. v. International Milling Co.*, 401 F.2d 568, 572 (2d Cir. 1968). Thus in *Trafalgar* the Court of Appeals for the Second Circuit stated:

> Moreover, in our view, laches is not a technical legal issue which only a judge is competent to decide. Rather, in the often esoteric field of commercial dealings, and in admiralty, it would seem that the severity of prejudice suffered through delay, and the reasonableness of excuses offered by the dilatory party, the elements of lach-

es, might be resolved better where resort is had to the expertise of the arbitrators.

*Id.*

No purpose would be served by a detailed analysis of the numerous cases cited by Tappan on the waiver and laches issues. Suffice it to say that state cases are irrelevant, others cited preceded *Prima Paint,* and still others have lost their precedential value by reason of cases later decided in the same circuits, *e. g., Halcon* and *Trafalgar, supra.*

### TAPPAN'S MOTION TO DISMISS FOR LACK OF INDISPENSABLE PARTY

■ This motion is denied. American is not a party to the Agreement and, therefore, cannot be compelled to enter into arbitration. It cannot be bound by any decision of the arbitrators unless it chooses to participate voluntarily in the proceeding. *Orion Shipping and Trading Co. v. Eastern States Petroleum Corp. of Panama, S.A.,* 312 F.2d 299 (2d Cir.), *cert. denied,* 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705 (1963).

### CONCLUSION

For the foregoing reasons, Singer's motion is granted and Tappan's motion is denied.

Submit an appropriate order.

---

12. The *Halcon* court does fortify its Sections 2 and 3 analysis with a reference to the "broad" arbitration clause before it. 446 F.2d at 160. Nonetheless, a careful reading of the opinion dispels the notion that this reference was more than treatment of laches under Section 4.

Worthy of note is the *Halcon* court's distinguishing of its earlier decision in *Operating Engineers v. Flair Builders, Inc.,* 440 F.2d 557 (7th Cir. 1971), on the basis of *Flair* having arisen under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185), "which does not contain the restrictive lan-

guage relating to court jurisdiction . . . of the Arbitration Act" and on the basis of its involving the issue of "extrinsic untimeliness, separate and apart from the principal contract". 446 F.2d at 162. Thus in *Flair* the court had approved the district court deciding the issue of laches. After *Halcon,* the Supreme Court, in 1972, reversed *Flair,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248, holding that a laches defense had to be submitted to the arbitral process even if "extrinsic" in view of the broad "any difference" arbitration clause.