**HALCON INTERNATIONAL, INC.,**
Respondent-Appellant,

v.

**MONSANTO AUSTRALIA LIMITED,**
Petitioner-Appellee.

No. 18669.

United States Court of Appeals,
Seventh Circuit.

July 9, 1971.

Rehearing Denied Aug. 11, 1971.

Lloyd W. Bowers, Chicago, Ill., Edward N. Costikyan, New York City, Gardner, Carton, Douglas, Chilgren & Waud, Chicago, Ill., Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for respondent-appellant; Sidney S. Rosdeitcher, Selvyn Seidel, New York City, of counsel.

Harlan L. Hackbert, Chicago, Ill., Jerome N. Groark, Chicago, Ill., for petitioner-appellee.

Before SWYGERT, Chief Judge, KILEY and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal raises the question of whether the federal court or the arbitrator shall determine the merits of the defense of laches under the Federal Arbitration Act. 9 U.S.C. §§ 1–14.

On May 7, 1962, Monsanto Australia Limited, then named Monsanto Chemicals (Australia) Limited ("Monsanto"), a corporation organized under the laws

of the Commonwealth of Australia with its principal office in Melbourne, and Halcon International, Inc., then named Scientific Design Company, Inc. ("Halcon"), a corporation organized under the laws of Delaware with its principal office in New York City, entered into an agreement for the design and engineering of a plant to be constructed in Australia for the manufacture of phenol under a process developed by Halcon.

Halcon guaranteed that when completed the plant would be "capable of producing phenol conforming to specifications set forth in Annex B–I at an average rate of at least 2,275 pounds per hour when based on an operating year of 7,920 hours, and with a yield of at least 95.5 pounds of specification phenol for each 100 pounds of benzene contained in the feedstock consumed."

The plant began operating on November 15, 1964. Halcon has conceded that the plant's "performance fell short of the standards set by the agreement."

In September, 1965, Monsanto took control of the operations of the plant, but Halcon's personnel remained at the plant until May, 1967.

On June 1, 1966, representatives of Monsanto and Halcon met. This meeting resulted in alternative written suggestions by Halcon to Monsanto dated July 21, 1966, which would have required additional expenditures by Monsanto of $600,000 followed by either another $850,000 or $1.9 million. No representation was made by Halcon that after Monsanto made these expenditures the guaranteed yield would be satisfied; in fact, one of Halcon's officers conceded that it would not.

Discussions between representatives of Monsanto and Halcon continued through November, 1966. On December 22, 1966, Monsanto advised Halcon that it had considered Halcon's recommendations, had "determined not to spend the added capital via this process" and stated that "for Monsanto the books are now closed."

On July 11, 1967, Monsanto advised Halcon of its intent to "cannibalise the various bits and pieces of the plant" and sought assurance from Halcon that "none of the plant is protected by patents" or otherwise. The plant was shut down in July, 1968, without the guarantee ever having been satisfied.

In November, 1968, a Monsanto representative sought a meeting with a Halcon representative with respect to the plant. A meeting was held on January 9, 1969, at which time Monsanto's claims for damages as a result of Halcon's failure to meet the guarantee in the agreement were discussed. A detailed breakdown of the dollar amount of the claims was furnished on April 22, 1969, by Monsanto to Halcon "to facilitate discussions."

A written demand for arbitration of the claims in accordance with the arbitration clause of the May 7, 1962, agreement was made by letter from Monsanto to Halcon dated December 9, 1969. Halcon filed an action against Monsanto in the Delaware Court of Chancery on December 15, 1969, seeking to enjoin Monsanto from proceeding to arbitration. On December 19, 1969, Monsanto filed its petition in the district court seeking an order directing Halcon to proceed to arbitration and staying the proceedings in Delaware. Halcon filed its answer to the petition, including an affirmative defense based on laches, and Monsanto moved for immediate relief; both parties submitted affidavits in support of their respective positions.

The district court found that it had jurisdiction over the subject matter and parties and entered an order directing Halcon to proceed to arbitration and staying the proceedings in the Court of Chancery in Delaware. The district court disposed of the laches defense by holding that the merits of that defense were to be determined by the arbitrators and not by the court. The district court concluded, "The parties agreed to submit all controversies to arbitration; had they intended to preclude arbitration of the issue of laches they could have expressly

so provided in their contract. Moreover, by leaving the matter of laches to the arbitrators the purposes of the Arbitration Act, avoiding the expense and delay of pre-arbitration court proceedings, are fulfilled."

The agreement between the parties dated May 7, 1962, stated that it and certain exhibits attached to it "constitute the full understanding between the parties hereto with reference to the subject matter hereof * * * and neither party shall claim any amendment, modification or release from any provision hereof * * * unless such agreement is in writing signed by the other party and specifically states that it is an amendment to this Agreement."

The agreement further provided:

The failure of a party hereto at any time to exercise any of its rights or options under this Agreement, save rights and options *specifically limited as to date of exercise thereof*, shall not be, or be construed to be, a waiver of such rights or options or prevent such party from subsequently asserting or exercising such rights or options (emphasis added).

The language of the agreement "in the event the guarantee * * * has not been fulfilled or discharged," provided for Monsanto to elect certain options "at any time" after the first anniversary of the start-up of the plant, followed by meetings of the parties "to determine a course of action to be followed."

The agreement also included a broad arbitration clause, which read in part:

All claims, disputes, questions and controversies (other than claims of breach of secrecy obligations) that shall arise under or in connection with this Agreement which cannot be resolved between the parties shall be submitted to and be determined by a board of three arbitrators. Any such arbitration shall be conducted at Chicago, Illinois. * * *

The board so constituted shall conduct the arbitration pursuant to the Commercial Arbitration Rules then in

effect of the American Arbitration Association. * * *

This agreement to arbitrate shall be specifically enforceable under the prevailing law with respect to enforcement of arbitration awards. * * *

Halcon contends that Monsanto was obliged to demand arbitration in December, 1966, and that its failure to do so has impaired Halcon's ability to defend against Monsanto's claims: one witness has since left Halcon's employ and now resides in Australia; Halcon has no witnesses for the period after May, 1967, when its employees left the plant site; and "it cannot give a concrete demonstration of the feasibility of its proposal for plant improvement through performance tests and inspection of the plant operations" since the plant is shut down and dismantled.

The answer to the question of whether the merits of the defense of laches as raised in the circumstances of this case are to be determined by the arbitrators or by the court depends in the first instance upon a reading of the statute.

Section 2 of the Arbitration Act of 1925 provides in part, "A written provision in * * * a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction * * * *shall be* valid, irrevocable, and *enforceable, save upon such grounds as exist* at law or in equity *for the revocation of any contract"* (emphasis added).

Section 4 provides in part:

The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

In this case there is no dispute as to the "making" of the agreement which included the arbitration clause or as to the failure of Halcon to comply with the clause. But Halcon contends that "mak-

ing" includes "unmaking" and that laches "unmakes" the agreement to arbitrate.

■ The doctrine of laches, like statutes of limitations, merely bars the remedy but does not discharge the right. 6 Williston, Contracts § 2002, page 5628 (Rev.Ed., 1938); Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885). It is a shield of equitable defense rather than a sword for the investiture or divestiture of legal title or right. 27 Am.Jur.2d, Equity § 152, 30A C.J.S. Equity § 113. When laches are applied, the contract becomes unenforceable but not invalid. *Cf.* Restatement of Contracts, § 86. Thus the Restatement of Contracts distinguishes between voidable contracts (such as those induced by fraud, mistake or duress) and unenforceable contracts (such as those where enforcement is barred because of a statute of limitations, discharge in bankruptcy or statute of frauds). Restatement of Contracts, §§ 13, 14. Assuming that the positive "making" of Section 4 infers the negative "unmaking," such "unmaking" would appear to be limited to invalidation rather than to rendering unenforceable.

In considering the meaning of the word "making" in Section 4, note must also be taken of the meaning of "revocation" in Section 2. The word "revocation," when used in a contractual context, ordinarily refers to revocation of an offer or an option; but it is used in Section 2 of the Arbitration Act to apply to a contract and in that connotation obviously is intended to be synonymous with "rescission." Rescission is an appropriate remedy when, for example, a contract is induced by fraud, mistake or duress, and is "used chiefly where the termination of the contractual relation is by mutual consent." 5 Williston, Contracts § 1454A, page 4063 (Rev.Ed., 1937). "Revocation" and "cancellation" are closely synonymous; to revoke means "to annul, repeal, rescind, cancel." Glenram Wine & Liquor Corp. v. O'Connell, 295 N.Y. 336, 67 N.E.2d 570 (1946).

Since the savings clause of Section 2 is limited to "revocation," this is clearly the only type of "unmaking" contemplated by the act—that is, an unmaking resulting from the mutual cancellation of the contract by the parties or the voiding of the transaction due to fraud, mistake or duress. Such a construction does not encompass the unenforceability of a contract due to laches.

Therefore Section 4 alone or together with Section 2 gives the federal courts no jurisdiction under the Arbitration Act, when presented with an agreement to arbitrate which has not been revoked, to do other than to "make an order directing the parties to proceed to arbitration." The defense of laches then becomes a matter for the determination of the arbitrators.

This plain construction of the statute is supported by the preponderant weight of the public policy arguments inherent in the recognition of arbitration and by the weight of judicial authority construing the United States Arbitration Act.

At the outset, a distinction should be made between arbitration provisions in collective bargaining agreements enforceable under § 301 of the Labor Management Relations Act (29 U.S.C. § 185), which does not contain the limiting language of Sections 2 and 4 of the Arbitration Act, and commercial arbitration in accordance with the latter act. The Supreme Court pointed out in United Steelworkers of America A. F. L.–C. I. O. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), that "arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement," such as the agreement involved here.

In a commercial arbitration case, Galt v. Libbey-Owens-Ford Glass Co., 376 F. 2d 711 (7th Cir. 1967), this court has set forth some of the policy considerations which govern at page 714:

Under the Federal Arbitration Act, the courts have been assigned the limited role of "ascertaining whether the

party seeking arbitration is making a claim which on its face is one governed by the agreement". * * * The policy of the Federal Arbitration Act is to promote arbitration to accord with the intention of the parties and to ease court congestion. * * * All doubts are to be resolved in favor of arbitration. * * * Whenever possible, the courts will use the Federal Arbitration Act to enforce agreements to arbitrate. * * *

In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 127 (1967), the Supreme Court considered a "broad" arbitration clause in a commercial contract, as here, and considerably narrowed the role of the court vis-a-vis the arbitrator. Whereas a reading of the statute might warrant the conclusion that fraud of any kind could be considered by the court as a "revocation" of a contract, in Prima Paint the Court held at pages 403–404, 87 S.Ct. at page 1806 (footnote omitted):

> Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

The Court found that the language that "any controversy or claim arising out of or relating to this Agreement, or the breach thereof" be arbitrable was broad enough to encompass defenses that both execution and acceleration of the agreement were procured by fraud. See also Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2nd Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

In Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568 (2nd Cir. 1968), Trafalgar demanded arbitration under a commercial agreement in August, 1966, of claims relating to damages to a vessel occurring in early 1961. International defended on the ground that Trafalgar's right to arbitrate was barred by laches. In support thereof, it submitted affidavits showing that Trafalgar's long delay in asserting its claim had left International powerless to defend itself before the arbitrators, owing to the death or disappearance of witnesses to the grounding, the loss of evidence to show the cause of damages to the vessel and other difficulties. The court of appeals concluded that, "In our view, all of these approaches [the purpose of the laches doctrine, the objectives of the federal Arbitration Act and prior Second Circuit cases] lead to the conclusion that the issue of laches as it presents itself in this case is one for the arbitrators to decide." [1] 401 F.2d at 571.

The court further noted: [2]

> Moreover, in our view, laches is not a technical legal issue which only a

1. The court added that "if a party were to assert that the agreement for arbitration was procured through fraud or duress, raising a question as to its 'making,' * * * the court might then consider whether evidence essential to the proof of this defense had, owing to the unexcused delay of the moving party, become unavailable. * * *" 401 F.2d at 571–572.

2. In a dissenting opinion in Prima Paint, Mr. Justice Black, arguing that fraud in the inducement is better resolved by courts, speculated that arbitrators "in all probability will be nonlawyers" and "their compensation corresponds to the volume of arbitration they perform." 388 U.S. at 407 and 416, 87 S.Ct. at 1808 and 1812. Chief Judge Lumbard dissented in Trafalgar and voiced a similar opinion: "Once [the arbitrators] have bitten into the enticing fruit of controversy, they are not apt to stay the satisfying of their appetite after one bite." 401 F.2d at 573–574. In Coulson, Prima Paint: An Arbitration Milestone, 23 Bus.Law, 241, 246 (1967), it is noted: "In many modern arbitration tribunals, all or most of the arbitrators are lawyers. And it is certainly not true that commercial arbitra-

judge is competent to decide. Rather, in the often esoteric field of commercial dealings, and in admiralty, it would seem that the severity of prejudice suffered through delay, and the reasonableness of excuses offered by the dilatory party, the elements of laches, might be resolved better where resort is had to the expertise of the arbitrators. 401 F.2d at 572.

Halcon contends that the court should rule on laches, inasmuch as dilatory conduct amounting to "waiver" of the arbitration agreement is a "default in proceeding with such arbitration" within the meaning of Section 3 of the Arbitration Act. Cornell & Company v. Barber & Ross Co., 123 U.S.App.D.C. 328, 360 F.2d 512 (1966). In that case, "the litigation machinery had been substantially invoked and the parties were well into the preparation of a lawsuit" when, some four months after the complaint was filed, the demand for arbitration was first made. In the present case, the arbitration demand was made prior to Monsanto's seeking to stay the Delaware judicial proceedings and no "waiver" of the kind involved in *Cornell* occurred. It is settled that delay in making an arbitration demand is not a default within the meaning of Section 3. Almacenes Fernandez, S. A. v. Golodetz, 148 F.2d 625, 627–628 (2nd Cir. 1945); Hilti, Inc. v. Oldach, 392 F.2d 368, 372, n. 9 (1st Cir. 1968); Batson Yarn and Fabrics Machinery Group, Inc. v. Sauer-Allma GmbH-Allgauer Maschinenbau, 311 F. Supp. 68, 72–74 (D.S.C.1970).

Halcon cites two other cases: Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978 (2nd Cir. 1942), where the court found no default

under Section 3 by a defendant which had answered in the judicial proceeding and nine months later filed an amended answer setting up an arbitration clause as a separate defense; and Carcich v. Rederi A/B Nordie, 389 F.2d 692 (2nd Cir. 1968), where the court also found no waiver despite participation by the party in judicial proceedings and said, "Waiver * * * is not to be lightly inferred." 389 F.2d at 696.

In the Section 3 cases the courts are directed by the statute to stay their own judicial proceedings pending the completion of arbitration "providing the applicant for the stay is not in default in proceeding with such application." Thus Section 3 expressly gives the courts jurisdiction to determine the existence of a default. Monsanto is not guilty of default or waiver by judicial participation under Section 3 in the present case. "Waiver" in the laches or estoppel sense, rather than in the default sense or participating in judicial proceedings, was held to be an issue to be decided by the arbitrators and not by the court in World Brilliance Corp. v. Bethlehem Steel Co., 342 F.2d 362 (2nd Cir. 1965).[3]

Halcon relies upon Nortuna Shipping Co. v. Isbrandtsen Co., 231 F.2d 528 (2nd Cir.), cert. denied, 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956) (no indication that issue of whether laches should be determined by arbitrators was raised); Reconstruction Finance Corp. v. Harrisons & Crosfield Ltd., 204 F.2d 366 (2nd Cir.), cert. denied, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953) (distinguished in *Trafalgar*); and In re Sociedad Armadora Aristomenis Panama, 244 F.Supp. 653 (S.D.N.Y.1965)

tors depend for their compensation upon 'the volume of arbitration they perform.' Under AAA administration, arbitrators generally volunteer their services except in cases that involve several hearings, or where the parties mutually agree to compensate them; and even then the compensation is generally nominal. In less than 10% of the non-labor cases administered by the AAA are the arbitrators compensated. Thus, it is unlikely that

a commercial arbitrator will be motivated to assert jurisdiction for personal reasons."

3. Laches as well as waiver was involved in *World Brilliance*, but the court said, "Because neither party argues that the issue of laches should have been left to the arbitrators, we find it unnecessary to examine the authorities on this question." 342 F.2d at 365, n. 1.

(overruled in Trafalgar). These cases are no longer good authority in view of the Second Circuit's most recent ruling that the question of laches is for the arbitrators and not for the court in Trafalgar Shipping Co. v. International Milling Co., 401 F.2d 568 (2d Cir. 1968).

Up to this point we have limited our discussion to commercial arbitration cases. However, Halcon has also relied upon three labor arbitration cases: Amalgamated Clothing Workers of America, A. F. L.–C. I. O. v. Ironall Factories Co., 386 F.2d 586 (6th Cir. 1967); ITT World Communications, Inc. v. Communications Workers, 422 F.2d 77 (2nd Cir. 1970); and International Union of Operating Engineers Local 150, A. F. L.–C. I. O. v. Flair Builders, Inc., 440 F.2d 557 (7th Cir. 1971).

The *ITT* case raises the same question as the commercial arbitration cases raised under Section 3 of the Arbitration Act: whether participation in judicial proceedings waives the right to arbitrate. In *ITT* the court held that waiver was not established.

Our decision in *Flair Builders*, which relied to some extent upon *Ironall*, demonstrates the difficulty in attempting to apply labor arbitration cases to commercial cases governed by the specific language of a particular statute. In *Flair Builders*, the majority of the court affirmed the district court's finding "that there had been no contact whatsoever between the union and Flair from the date of the signing of the memorandum of agreement in 1964 until the summer of 1968," while the arbitration clause was incorporated in a 1966 master agreement between the union and a contractor association. Had *Flair Builders* been a commercial rather than a labor case, the court could have reached its decision simply by applying Section 4 of the Arbitration Act and finding that "the making of the agreement for arbitration" was in issue.

But aside from the fact that both *Ironall* and *Flair Builders* arose under Section 301 of the Labor Relations Management Act (29 U.S.C. § 185), which does not contain the restrictive language relating to court jurisdiction found in Sections 2 and 4 of the Arbitration Act, they are both readily distinguishable. In *Ironall*, the court emphasized that its decision did not involve interpreting the collective bargaining agreement. In *Flair Builders*, we decided that *extrinsic* untimeliness, separate and apart from the principal contract, may be determined by the court. But we pointed out that *intrinsic* untimeliness—that is, untimeliness intrinsic to the entire contract and its interpretation—"must be determined by the arbitrator."

In this case, the question of timeliness or untimeliness involves the whole contract and its interpretation. As in *Prima Paint*, the written agreement here constituted the full understanding between the parties and the arbitration clause was as broad as words could make it. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 397–398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

The agreement also had a waiver clause which expressly provided that "the failure of a party hereto at any time to exercise any of its rights or options * * * save rights and options specifically limited as to date of exercise thereof, shall not be, or be construed to be, a waiver. * * *" It further provided that if the guarantee was not fulfilled, the parties would meet *"at any time"* after the first anniversary of the start-up of the plant "to determine a course of action to be followed."

As in *Prima Paint*, the entire contract, and not merely the arbitration clause, is in issue. The question of laches is intrinsic to the whole contract. Whether there was any inexcusable, unreasonable and prejudicial delay requires a fact-finding review of the entire contract and of all of the transactions occurring under it. It must be determined how the question of timeliness was affected by the conceded failure to meet the guarantee, by the efforts of the parties to solve the resulting problems, by the period of discussions between the parties, by the closing of the plant, by the changing conditions

and circumstances, by the importance of the knowledge of the witness who moved to Australia, and by a host of other problems requiring a certain amount of expertise by the fact-finders.

In view of all these considerations, we conclude that under the circumstances of this case the issue of laches is to be determined by the arbitrators. We affirm the order of the district court directing Halcon to proceed to arbitration and staying the proceedings in the Court of Chancery in and for New Castle County, Delaware.

Affirmed.

SWYGERT, Chief Judge (dissenting).

I respectfully dissent. Section 4 of the Federal Arbitration Act, if read alone, would confine the issues in an action seeking to enforce an arbitration agreement to (1) whether the agreement was made and (2) whether there has been a failure to perform it; however, that section must be read with section 2 of the Act which provides that commercial arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for revocation of any contract.*" (Emphasis added.)

I would not confine the meaning of the word "revocation" in section 2 to the narrow limits suggested by Judge Sprecher. In the context of the savings clause, I think the word encompasses not only rescission of an arbitration agreement induced by fraud, mistake or duress, but also its termination or "unmak-

ing" on equitable grounds of laches, estoppel or waiver.

In construing the Federal Arbitration Act, the Supreme Court in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), ruled that, despite the limitation of issues placed on a court by section 4 of the Act, the issue of whether an arbitration agreement has been induced by fraud is for the court to decide, as a preliminary matter, rather than for the arbitrator. If the issue of fraud in the inducement of the agreement must be decided by a court as a threshold issue in an enforcement proceeding under section 4, similar reasons require that laches as a preliminary issue must be decided by the court. Laches, like fraud constitutes a defense to the invocation of an agreement to arbitrate.[1] It appears anomalous to me to hold in one instance that the court may preliminarily inquire as to whether fraud induced the agreement and in the other that the arbitrator rather than the court must decide whether laches bars the very proceeding the court has ordered. To compound the anomaly, if the arbitrator determines that it would be inequitable to proceed because of the delay by one party in demanding arbitration and the resultant prejudice to the other party, the court in ordering arbitration would have in effect enforced unenforceable obligations on the parties.[2]

Furthermore, will all deference to the views of the majority, I am unable to distinguish in principle the instant case from our recent decision in International Union of Operating Engineers, Local

---

1. Fraud in the inducement does not render a contract void, but rather renders it avoidable and subject to ratification. 1A Corbin, Contracts § 6 at 12–13 and § 146 at 636 (1963). Fraud in the inducement thus does not nullify the making of the contract, but may render the contract unenforceable by a party because of his own conduct. By the same token, laches raised as a defense does not nullify the obligations of a contract, but may render them unenforceable by a party because of his own conduct.

2. As the Supreme Court noted in *Prima Paint:*

[T]he purpose of Congress [in enacting the Act] was to make arbitration agreements as enforceable as other contracts, but not more so. To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract—a situation inconsistent with the "savings clause" [of section 2 of the Act]. 388 U.S. at 404 n. 12, 87 S.Ct. at 1806.

That reasoning applies with equal force where laches is the issue.

150, AFL–CIO v. Flair Builders, Inc., 440 F.2d 557 (7th Cir. 1971). There we held that the district court properly entertained the question of laches raised as a defense to a demand to arbitrate pursuant to a collective bargaining contract. We relied for support on the Sixth Circuit's decision in Amalgamated Clothing Workers of America, A. F. L.–C. I. O. v. Ironall Factories Co., 386 F.2d 586 (6th Cir. 1967), another labor arbitration case. The fact that both *Flair* and *Ironall* arose under section 301 of the Labor-Management Relations Act and the instant suit is brought under the Arbitration Act is of no significance. The underlying principles defining the respective spheres of jurisdiction between courts and arbitrators are the same. Indeed, many of the cases cited as authority for the result in *Ironall* were cases which had arisen under the Arbitration Act.

I would reverse.