In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 23-2723

EIDO HUSSAM AL-NAHHAS,

*Plaintiff-Appellee,*

*v.*

777 PARTNERS LLC, *et al.*,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-00750 — **John J. Tharp, Jr.**, *Judge.*

———————————

ARGUED APRIL 9, 2024 — DECIDED FEBRUARY 19, 2025

———————————

Before EASTERBROOK, ROVNER, and JACKSON-AKIWUMI,
*Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Illinois resident Eido
Hussam Al-Nahhas took out four loans from an online lend-
ing company called Rosebud Lending LZO, doing business as
ZocaLoans. Those loans charged exorbitant interest rates of
up to nearly 700%—far beyond the rates allowed under Illi-
nois law. Al-Nahhas contends that ZocaLoans is, in fact, a
fraud orchestrated by two private equity firms, 777 Partners,

LLC, and Tactical Marketing Partners, LLC, to skirt state
usury laws. According to Al-Nahhas, those firms pay the
Rosebud Sioux Tribe a pittance to put its name on predatory
payday loan websites that gouge low-income individuals.
And if anyone sues the websites for violating state law, the
firms conveniently claim tribal sovereign immunity. Al-
Nahhas sued ZocaLoans and the firms anyway, for violating
Illinois usury statutes and the federal Racketeer Influence and
Corrupt Organizations Act.

For fourteen months, the defendants participated in litiga-
tion, including by filing their answer, fielding discovery re-
quests, and participating in status conferences. But then they
decided that they wanted to arbitrate. Citing an arbitration
provision in the four lending agreements that Al-Nahhas had
signed, they asked the district court to refer the case to an ar-
bitrator. The district court refused, finding that the defend-
ants had waived their right to compel arbitration by partici-
pating in litigation.

777 Partners, LLC, and Tactical Marketing Partners, LLC
now appeal. Before oral argument, the appellants also asked
us to rule the litigation moot based on the terms of Al-
Nahhas's settlement agreement with ZocaLoans. We con-
clude that the appellants indeed waived their right to arbi-
trate through their litigation conduct and that this case is not
moot. We therefore affirm the district court's judgment and
deny the appellants' motion.

**I**

This litigation concerns the legality of private equity firms
using a Native American tribe to evade Illinois law. At the
heart of this case are four loans that Eido Hussam Al-Nahhas,

an Illinois resident, took out from an online lending company called Rosebud Lending LZO, doing business as ZocaLoans. In January, March, May, and September of 2021, Al-Nahhas took out four loans from ZocaLoans' website of $350, $550, $750, and $900. The annual interest rates on those loans ranged from 534.75% to 693.10%—exponentially higher than allowed under Illinois law. Al-Nahhas repaid the first three of those loans, but the fourth—a $900 loan with a 585.21% interest rate—remains outstanding.

ZocaLoans holds itself out as a "sovereign enterprise" that is "wholly owned and controlled by" the federally recognized Rosebud Sioux Tribe. But Al-Nahhas alleges that this Native American ownership is just a front. In reality, he contends, ZocaLoans is operated by 777 Partners, LLC, and its subsidiary, Tactical Marketing Partners, LLC, both of which are nontribal entities based in Miami and organized under Delaware law. Al-Nahhas alleges that Tactical Marketing Partners underwrites the loans that ZocaLoans issues and provides the technology, infrastructure, and marketing. In return for ZocaLoans' compliance, Tactical Marketing Partners pays the Rosebud Sioux Tribe a small percentage of the revenues it derives from the high-interest loans. ZocaLoans, Al-Nahhas says, is no more than a "rent-a-tribe scheme"—the practice of non-Native organizations using Native American tribes as "a cloak of sovereign immunity for lending activities."

On February 10, 2022, Al-Nahhas filed a federal class-action suit against ZocaLoans, 777 Partners, and Tactical Marketing Partners. Al-Nahhas's complaint contained three counts targeting all three defendants: (1) a request for declaratory and injunctive relief declaring the high-interest rates void; (2) a violation of the Illinois Interest Act, 815 ILSC 205/4;

and (3) a violation of the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 et seq., which is a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. The complaint contained an additional count against 777 Partners and Tactical Marketing Partners for violating the federal Racketeer Influence and Corrupt Organizations Act.

For fourteen months, the litigation was plagued by delay and dysfunction. None of the defendants met their deadline to file an answer. Then they belatedly requested more time to answer, explaining that they were engaged in settlement discussions with Al-Nahhas. The district court acquiesced, but the defendants missed the extended deadline too. At that point, Al-Nahhas successfully moved for entry of a default judgment against the defendants. This drew the defendants' attention. They moved to set aside the default, the district court again acquiesced, and on September 1, 2022, the defendants finally responded to Al-Nahhas's complaint. They listed five affirmative defenses and requested a jury trial.

For the next seven months, the defendants repeatedly assured the court and Al-Nahhas that they intended to continue participating in the litigation. When the defendants missed the deadlines to file their initial disclosures and their reply to Al-Nahhas's first discovery requests, they told the district court that they were working on producing those materials. After Al-Nahhas moved to compel discovery, the defendants submitted a joint status report with Al-Nahhas saying they "agreed to serve full and complete responses to Plaintiff's discovery requests." And the defendants responded to Al-Nahhas's second and third sets of discovery requests.

But the defendants made an about-face on April 7, 2023, when they moved, for the first time, to compel arbitration. The defendants pointed to an arbitration provision in the loan contracts that Al-Nahhas signed with ZocaLoans. The provision specified that "[a]ll Disputes, including any Representative Claims against us and/or related third parties, shall be resolved by arbitration." It also specified that "[t]he arbitrator shall apply the laws of the Rosebud Sioux Tribe that govern this Agreement" and "[t]he laws of the Rosebud Sioux Tribe ('Tribal Law') will govern this Agreement, without regard to the laws of any state or other jurisdiction."

While the motions to compel were pending before the district court, Al-Nahhas settled with ZocaLoans. That left only the motion to compel filed by 777 Partners and its subsidiary Tactical Marketing Partners (jointly, the "777 Defendants").

The district court denied the 777 Defendants' motion, finding that they had waived their right to compel arbitration through their litigation conduct. The court first determined that it, not an arbitrator, should decide if the defendants waived their right to arbitration. It then found that the 777 Defendants had waived their right to arbitration because during the fourteen months that the case had been pending, the defendants never once said anything about arbitration. The court observed that the defendants had led Al-Nahhas "on a fruitless discovery chase," forcing Al-Nahhas to compel discovery, all the while assuring the court that they intended to comply with the discovery requests. The court then decided that, even if the defendants had *not* waived their right to compel arbitration, the 777 Defendants could not compel arbitration under Illinois law because they were third-party beneficiaries to the contract. It also rejected the 777 Defendants'

argument that Al-Nahhas was equitably estopped from challenging the legality of the loans. Consequently, the district court retained jurisdiction over the dispute.

The 777 Defendants now appeal that decision. Since filing the appeal, the 777 Defendants have introduced another way to undo the district court's decision. They say that, at some point in January 2024, they discovered "through their business relationship with Rosebud Lending [LZO d/b/a ZocaLoans]" the terms of the settlement that Al-Nahhas reached with ZocaLoans. As a result, they have filed a motion asking us to rule the case moot because, as they see it, Al-Nahhas received more from the settlement than he could through a judgment. Relatedly, they also have moved to file under seal documents discussing the terms of the settlement agreement. Al-Nahhas disagrees that the settlement has mooted the case. He also has moved to file a supporting declaration under seal.

We now consider the merits of the appeal and the parties' motions.

## II

The parties posit that our standard of review is de novo, except that we review the district court's factual findings for clear error. This standard finds support in, for example, *Sosa v. Onfido, Inc.*, 8 F.4th 631, 638 (7th Cir. 2021). *See also Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 756 (7th Cir. 2002) ("The factual determinations that a district court predicates a finding of waiver [of the right to arbitrate] upon are reviewed for clear error, while the legal question of whether the conduct amounts to waiver is reviewed *de novo*."). However, as the concurrence points out, it is possible that the generally fact-intensive question before us (did the

777 Defendants waive their right to compel arbitration?) presents the type of mixed question that merits deference to the district court, not de novo review. *Post*, at 18–21; *see also Iowa Grain Co. v. Brown*, 171 F.3d 504, 508–09 (7th Cir. 1999) (noting how case law has applied inconsistent standards of review for "question[s] [of] whether a right to arbitrate has been waived" and applying a deferential standard "[b]ecause no one ha[d] claimed that the district court misinterpreted the contract or otherwise misunderstood the applicable law"). In any event, our conclusion is the same under either standard: the district court had the authority to decide whether the 777 Defendants waived their right to compel arbitration, and it rightly concluded that they did.

### A. Authority to Decide Waiver

An agreement to arbitrate is a contractual provision, and "[l]ike other contractual rights … the right to arbitrate is waivable." *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020). Before we decide whether the 777 Defendants waived that right, we first address who—the court or an arbitrator—properly decides that question in the first instance. The 777 Defendants contend that the district court lacked authority to make this decision and should have turned the matter over to an arbitrator. They argue that the issue of waiver is "procedural" and arbitrators, not courts, decide procedural issues. We do not agree.

The most recent authority from the Supreme Court suggests that courts, not arbitrators, determine whether a party waived its right to compel arbitration. In *Morgan v. Sundance, Inc.*, 596 U.S. 411, 413 (2022), the Court considered waiver of the right to compel arbitration. The Court wrote that when

parties engage in "months, or even years, of litigation … the *court* faces a question: Has the defendant's request to switch to arbitration come too late?" *Id.* (emphasis added). We take from that language that courts, not arbitrators, decide whether a party has waived the right to compel arbitration.

Our conclusion finds solid support in the text of the Federal Arbitration Act ("FAA") and in our precedent. The FAA provides that if two parties have agreed to resolve their disputes in arbitration but one of the parties then sues the other, "the court in which such suit is pending" must refer the case to arbitration upon the application of one of the parties, "providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. We have previously assumed that "default" in this section of the FAA encompasses waiver through litigation conduct, and we have signaled that courts decide if such default has occurred.

We suggested as much in *Halcon International, Inc. v. Monsanto Australia Limited*, 446 F.2d 156, 161 (7th Cir. 1971). There, Halcon argued that Monsanto had improperly delayed its demand to arbitrate a dispute, and Monsanto was therefore barred from arbitration under the principle of laches. Halcon further argued that a court, not an arbitrator, should decide the laches issue because "dilatory conduct" that bars enforcement of a contract under the rule of laches constituted a default under Section 3 of the FAA. *Id.* We disagreed with Halcon's argument about the implications of Monsanto's conduct. In our analysis, we compared the dispute with the D.C. Circuit case *Cornell & Co., Inc. v. Barber & Ross Co.*, in which "the litigation machinery had been substantially invoked and the parties were well into the preparation of a lawsuit" before one of the parties moved for arbitration. *Id.* (quoting *Cornell &*

*Co., Inc. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966)). The parties in *Cornell & Company*, we said, had "waiv[ed]" their right to compel arbitration. *Id.* Monsanto had not waived its right to compel arbitration because "delay in making an arbitration demand is not a default within the meaning of [the FAA's] Section 3." *Id.* Our analysis, therefore, suggested that a party is "in default" under the FAA when it waives its right to arbitrate by participating in litigation. *See id.*; 9 U.S.C. § 3. And the proper authority to determine if such default occurred is the courts because the text of the FAA "expressly gives the *courts* jurisdiction to determine the existence of a default." *Halcon Int'l*, 446 F.2d at 161 (emphasis added).

We came to the same conclusion in *St. Mary's Medical Center of Evansville, Inc. v. Disco Aluminum Products Co., Inc.*, 969 F.2d 585 (7th Cir. 1992). There, the district court ruled that St. Mary's had waived its right to compel arbitration by participating in litigation for ten months. In our analysis, we stated that "[n]o rigid rule exists as to what constitutes a waiver of the right to arbitrate"; rather, "[t]he essential question is whether, based on the circumstances, the alleged *defaulting party* has acted inconsistently with the right to arbitrate." *Id.* at 587–88 (emphasis added). We therefore implicitly determined that waiver is a form of default under Section 3 of the FAA, and we affirmed the district court's ruling that St. Mary's had waived its right to arbitrate. *Id.* at 591. *See also Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011) (explaining that courts determine whether a party waived its right to arbitrate by considering "whether the allegedly *defaulting party* participated in litigation" (emphasis added)).

Our sister circuits have likewise concluded that waiver through litigation conduct constitutes a default. *See, e.g., Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 13 (1st Cir. 2005) ("A 'default' has generally been viewed by courts as including a 'waiver.'"); *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 455 n.62 (4th Cir. 1997) ("[A] section 3 default … only encompasses the limited range of circumstances when a party seeking arbitration has 'substantially utiliz[ed] the litigation machinery' before pursuing arbitration ….") (quoting *Maxum Founds. Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985) (second alteration in original)); *Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n (Lux.)*, 62 F.3d 1356, 1365 n.16 (11th Cir. 1995) ("Although the [FAA] uses the term 'default,' the case law on this subject employs the term 'waiver.'" (internal citation omitted)). We see no reason to change course now, disagree with our sister circuits, and retroactively say that the district court in *St. Mary's* never had the power to issue the ruling that we affirmed.

Finally, we previously have explained that courts by nature are better suited than arbitrators to determine whether parties waived their right to arbitrate through litigation conduct. Waiver through litigation "is an intensely fact-bound question" that implicates the intricacies of the litigation process. *Brickstructures, Inc.*, 952 F.3d at 891. District courts are "in a better position to assess the parties' [litigation] conduct." *Id.* And, as the district court rightly observed in *Lukis v. Whitepages, Inc.*, 535 F. Supp. 3d 775, 786 (N.D. Ill. 2021), "[a]bsurd consequences would flow" from a ruling that arbitrators must decide the issue. For example, a party could move for arbitration in the middle of a trial and force the court to pause proceedings until an arbitrator decided if the trial could proceed. The FAA could not have intended such a

bizarre result. *See Senne v. Vill. of Palatine*, 784 F.3d 444, 447 (7th Cir. 2015) ("[S]tatutes have to be interpreted to avoid absurd results.").

The 777 Defendants' citation to Supreme Court dicta does not convince us otherwise. The 777 Defendants note that in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25 (1983), the Supreme Court stated that:

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of *waiver*, delay, or a like defense to arbitrability.

(emphasis added). But that language played no role in the Court's decision. There, parties to a contract dispute initiated conflicting suits, one in state court seeking a declaratory judgment barring arbitration, and one in federal court seeking arbitration. The district court stayed the federal case pending resolution of the state court action, a decision the Supreme Court found improper under the *Colorado River* abstention doctrine. The above quotation appears in a subsection that explains that when federal law governs the issue (there, the Federal Arbitration Act), that factors against abstention. What constitutes waiver and who decides the issue had nothing to do with the Court's reasoning. The waiver language is, therefore, dicta. *See also Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (explaining that the language in *Moses H.* of "FAA's 'policy favoring arbitration' [did] not authorize federal courts to *invent* special, arbitration-preferring procedural rules" (emphasis added)).

The 777 Defendants also rely on *Howsam v. Dena Witter Reynolds, Inc.*, 537 U.S. 79 (2002), to no avail. *Howsam* cited *Moses Cone*'s dicta on waiver without incorporating that dicta into its holding. Instead, the *Howsam* Court determined that the central question in its case was when the incident that gave rise to the conflict arose. The Court determined that an arbitrator should decide the question. Waiver through litigation conduct had nothing to do with the decision. *See id.* at 84–85. Consequently, we understand the reference to waiver in *Howsam* (and *Moses Cone*) precisely as our sister circuits do: "the Court was referring only to waiver, delay, or like defenses arising from non-compliance with *contractual* conditions precedent to arbitration." *JPD, Inc. v. Chonimed Holdings, Inc.*, 539 F.3d 388, 393–94 (6th Cir. 2008) (quoting *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 218-19 (3d Cir. 2007)).

In sum, the district court correctly determined that it had the authority to decide whether the 777 Defendants waived their right to arbitration through their litigation conduct.

## B. Litigation Conduct

Having resolved the authority issue, the next question is whether the 777 Defendants waived their right to compel arbitration. In the arbitration context, waiver "encompasses both intentional relinquishments and implicit abandonments of the right" to arbitrate. *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 499 (7th Cir. 2018). "[W]aiver can be express or implied through action." *Brickstructures, Inc.*, 952 F.3d at 891. When we evaluate whether waiver can be inferred, we consider whether "a party acted inconsistently with the right to arbitrate." *Kawasaki Heavy Indus.*, 660 F.3d at 994. That analysis is informed by "the diligence or lack thereof of the party seeking

arbitration—did that party do all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration?" *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). Factors include "whether the allegedly defaulting party participated in litigation, substantially delayed its request for arbitration, or participated in discovery." *Kawasaki Heavy Indus.*, 660 F.3d at 994. Evaluating the 777 Defendants' conduct in this light, we have no trouble concluding that they waived their right to arbitrate.

The 777 Defendants waited fourteen months from the time Al-Nahhas sued to file their motion to compel arbitration, and without good reason. The 777 Defendants cannot claim they were unaware of their ability to compel arbitration; Al-Nahhas attached the loan agreement, with the arbitration provision, to the complaint. Even so, the 777 Defendants waited more than a year after receiving the complaint before moving to compel arbitration. That is substantial, inexcusable delay.

During that time, the 777 Defendants participated in the litigation, including discovery. They produced thousands of documents and continually assured Al-Nahhas and the court that they would abide by court-ordered discovery deadlines. They also responded to two different requests from the court for status updates. And then, with discovery well underway and deadlines extended multiple times due to their dilatory conduct, the 777 Defendants requested arbitration. Those actions are inconsistent with an intent to pursue arbitration.

The 777 Defendants try to excuse their conduct by complaining that they had a bad lawyer. Once they had competent representation, they say, they moved expeditiously to compel arbitration. That is neither convincing nor relevant for

two reasons. One, these are sophisticated parties who had the loan agreements at their disposal, and so they should have known to exercise their right to arbitrate. *Cf. Smith*, 907 F.3d at 500 ("The initial suggestion that GC Services—a sophisticated debt collection agency—would be unaware that credit card agreements routinely include arbitration agreements is suspect."). Two, even if the 777 Defendants had incompetent counsel, their counsel acted as their agent, and they are bound by their counsel's actions. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (internal quotations omitted)); *Lombardo v. United States*, 860 F.3d 547, 552 (7th Cir. 2017) ("[P]arties are bound by the acts of the attorney they choose to represent them, just as a principal is bound by the acts of its agent.").

We therefore conclude the 777 Defendants waived their right to compel arbitration through their litigation conduct, and they have no grounds to claim otherwise. Because we find that the 777 Defendants waived their right to compel arbitration, we need not consider the parties' additional arguments about whether the 777 Defendants can enforce the arbitration agreement as third parties or based on equitable estoppel principles.

### C. Mootness

We now turn to the motions before this court. The 777 Defendants ask us to consider the case moot and vacate the district court's judgment. They claim that Al-Nahhas gained more from his settlement than he could from a court order, so the case is moot because of the prohibition against double recovery. We disagree.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (citation and internal quotations omitted). In general, under federal and Illinois law, when a plaintiff sues multiple parties, settles with one of them, and prevails over the other parties in court, the court will deduct from the recovery the amount that the plaintiff received through the settlement. *See Janusz v. City of Chicago*, 832 F.3d 770, 774 (7th Cir. 2016). This is known as the "single-recovery rule." *Id.* But the single-recovery rule does not apply to punitive damages, which are at issue in this case. The single-recovery rule applies "*only* [to] compensatory damages; punitive damages do not measure the plaintiff's loss, so piling them on top of compensatory damages is permissible." *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987). Al-Nahhas has requested punitive damages pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act. As a result, the single-recovery rule does not moot his case.

The 777 Defendants argue that Al-Nahhas's request for punitive damages is not the end of the matter. They contend that an award of punitive damages in this case would let Al-Nahhas recover more than nine times what he could receive

as compensatory damages. That, they argue, would violate
the Due Process Clause of the Fourteenth Amendment. We
need not consider whether the 777 Defendants' numerical as-
sertions are correct, because even if Al-Nahhas *did* receive
more than nine times the maximum amount of available com-
pensatory damages, that would not automatically violate the
Due Process Clause. Courts presume that punitive damages
should amount to no more than nine times the compensatory
damages; but that presumption serves as a *guidepost*, not a
mechanical rule. *See Saccameno v. Bank Nat'l Ass'ns*, 943 F.3d
1071, 1088 (7th Cir. 2019) (noting that "few [punitive dam-
ages] awards exceeding a single-digit ratio to a significant de-
gree will satisfy due process," but "the ratio is flexible" (inter-
nal citation and quotations omitted)). Although excessively
high ratios of punitive to compensatory damages *may* be un-
constitutional, "[h]igher ratios may be appropriate when
there are only small damages …. [T]he ratio should not be
confined to actual harm, but also can consider potential
harm." *Id.* Consequently, whatever the contents of the settle-
ment agreement, it did not moot Al-Nahhas's claim. Any con-
stitutional issues are a matter for another day. Further, be-
cause Al-Nahhas's request for punitive damages resolves this
issue, we need not consider the parties' arguments about the
role that attorneys' fees play in the single-recovery rule or
whether Al-Nahhas's request for preliminary injunction pre-
vents the case from becoming moot.

Finally, we consider the parties' motions to file three doc-
uments under seal: two declarations and a Reply Brief that
discuss the terms of the settlement agreement. In our Circuit,
documents "that influence or underpin the judicial decision
are open to public inspection unless they meet the definition
of trade secrets or other categories of bona fide long-term

confidentiality." *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 545 (7th Cir. 2002). Since the terms of the settlement agreement did not influence our decision on mootness, we grant the motions to file under seal.

## III

For the above reasons, we affirm the district court's decision, find the case not moot, and grant the parties' motions to file under seal.

EASTERBROOK, *Circuit Judge*, concurring. I join my colleagues' opinion but offer some additional thoughts about one proposition that does not affect the outcome.

The court's opinion recounts (slip op. 6) the parties' understanding that we review de novo a district court's order denying a motion to compel arbitration. Decisions such as *Sosa v. Onfido, Inc.*, 8 F.4th 631, 638 (7th Cir. 2021), support that view, though *Sosa* does not give a reason. Instead it cites *Druco Restaurants, Inc. v. Steak N Shake Enterprises, Inc.*, 765 F.3d 776, 779 (7th Cir. 2014). *Druco* also does not supply a reason but cites *Gore v. Alltel Communications, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012), and *Lumbermens Mutual Casualty Co. v. Broadspire Management Services, Inc.*, 623 F.3d 476, 480 (7th Cir. 2010). These decisions contain language almost identical to that of *Sosa*, but they too omit reasons. *Lumbermens* does say that arbitrability is a legal issue, citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964), but does not try to explain why all other issues affecting arbitration likewise are matters of law or how this affects the standard of appellate review. *Lumbermens* also cites *Zurich American Insurance Co. v. Watts Industries, Inc.*, 466 F.3d 577, 580 (7th Cir. 2006), which has an almost identical passage—and, no surprise by now, no explanation.

As far as I can tell, these statements (and similar ones in other decisions) stem indirectly from *Machinists Union v. Fansteel, Inc.*, 900 F.2d 1005, 1010 (7th Cir. 1990), which says that questions of arbitrability are reviewed without deference to an arbitrator. That proposition comes from *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643 (1986), which holds that a judge rather than an arbitrator decides whether the parties have agreed to arbitrate. Through a process in the

nature of a rumor chain, the statement that arbitrability is a subject for a district judge morphed into the proposition that all judicial orders to arbitrate are reviewed independently by appellate judges. Nothing of the kind appears in or can be imputed to *AT&T Technologies* or *John Wiley & Sons*, neither of which concerns standards of appellate review.

*Sosa*'s unreasoned proposition about de novo appellate decisions lacks provenance in a statute, rule, or common-law tradition. Worse, it contradicts views expressed by the Supreme Court. Courts of appeals are fond of saying that they make independent (de novo) decisions about mixed questions of law and fact—that is, about the application of legal rules to the facts of particular cases. But that is not what the Supreme Court has told us to do. Its most recent extended analysis of the subject in ordinary civil litigation comes in *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 583 U.S. 387 (2018), which says:

> Mixed questions are not all alike. … [S]ome require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard. When that is so—when applying the law involves developing auxiliary legal principles of use in other cases—appellate courts should typically review a decision de novo. But … other mixed questions immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address what we have (emphatically if a tad redundantly) called "multifarious, fleeting, special, narrow facts that utterly resist generalization." And when that is so, appellate courts should usually

> review a decision with deference. In short, the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work.

583 U.S. at 395–96 (cleaned up; footnote and citations omitted). (The Supreme Court has used a different approach in immigration law, where the law/fact classification may control whether the Judicial Branch as a whole plays any role. *Wilkinson v. Garland*, 601 U.S. 209, 221–22 (2024). Decisions such as *Wilkinson* do not address standards of appellate review within the judiciary.)

Instead of saying that appellate judges always decide independently whether a dispute must be arbitrated, we should employ the distinction established by the Supreme Court. To apply *Lakeridge* we must ask whether the parties' dispute concerns the substance of the legal principles (which implies plenary appellate resolution) or how an established legal principle applies to the dispute at hand (which implies deferential appellate review). And it is not hard to see how that works for this appeal. There is a dispute about *arbitrability* (777 Partners is not a party to the contract between Al-Nahhas and ZocaLoans), but that is not the ground on which the district court acted. The standard for *waiver* of arbitration entails case-specific, discretionary assessments. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). The parties disagree about how the district judge should have evaluated 777 Partners' delay in demanding arbitration. That kind of dispute calls for deferential review under *Lakeridge* (and under *Morgan* too).

Some panels of this circuit have reached just this conclusion. *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995), states flatly: "Review of a finding

that a party has waived its contractual right to invoke arbitration is for clear error only; it is not plenary." And *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020), cites *Lakeridge* for the proposition that "[w]hether a party has waived its right to arbitrate by acting inconsistently with the right is … a mixed question, so we appropriately review the district court's determination with deference." Alas, many decisions after 1995 ignored *Cabinetree*, and *Brickstructures* did not mention the contrary statements in some of this circuit's post-1995 opinions. *Sosa* then asserted the opposite of *Brickstructures*, leaving our doctrine in shambles. See also *Iowa Grain Co. v. Brown*, 171 F.3d 504, 508–09 (7th Cir. 1999).

Many opinions contain formulaic statements of the standard of review that can be traced through a long chain of equally unreasoned citations. Every once in a while a court of appeals must stop and ask whether a formula from decades or generations ago represents the law articulated by the Supreme Court or other panels of this court. The approach in *Sosa* and its predecessors does not—it wrongly lumps arbitrability together with contextual matters such as waiver—and should be replaced. Today is not the day, however, not only because the parties have ignored this subject but also because on an independent view of things we come out the same way as the district judge. Occasionally, however, the standard of appellate review matters, and we should not employ formulas that depart from the Supreme Court's approach.